NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12340

JORGE RAMIREZ  vs.  COMMONWEALTH.

Suffolk.     December 5, 2017. - April 17, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, Cypher, & Kafker,
JJ.

Firearms.  Constitutional Law, Right to bear arms, Severability.
     Statute, Validity, Severability.

Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on March 21, 2017.

The case was reported by Hines, J.

Benjamin H. Keehn, Committee for Public Counsel Services,
for Jorge Ramirez.
Kathryn Leary, Assistant District Attorney, for the
Commonwealth.

GANTS, C.J.  We once again confront the question whether

the absolute criminal prohibition of civilian possession of a

stun gun, in violation of G. L. c. 140, § 131J, violates the

Second Amendment to the United States Constitution, which is

applied to the States by its incorporation into the Fourteenth

Amendment. In Commonwealth v. Caetano, 470 Mass. 774 (2015) (Caetano I), we held that § 131J did not violate the Second Amendment right to bear arms, as interpreted by District of Columbia v. Heller, 554 U.S. 570 (2008). However, the United States Supreme Court, in a brief per curiam opinion, concluded that each of the three explanations we offered to support this holding were inconsistent with propositions stated in Heller, and therefore vacated the judgment and remanded the case for further proceedings. See Caetano v. Massachusetts, 136 S. Ct. 1027 (2016) (Caetano II). That case was later dismissed as moot after it was "resolved . . . to [the parties'] mutual satisfaction," so we did not there revisit the question of § 131J's constitutionality. But we must revisit it in this case, where the defendant was charged in a criminal complaint with possession of a stun gun, in violation of § 131J, among other crimes, and moved unsuccessfully to dismiss that count of the complaint, arguing that § 131J unconstitutionally infringes on his Second Amendment rights.

We conclude that the absolute prohibition against civilian possession of stun guns under § 131J is in violation of the Second Amendment, and we order that the count of the complaint charging the defendant with such possession be dismissed with prejudice.

Background.  We summarize the agreed-upon facts relevant to this appeal.  On November 5, 2015, at approximately 2:15 A.M., Officer Sean Matthews of the Revere police department was on patrol when he observed a vehicle with a broken taillight that was being operated in what he believed to be a suspicious manner in an area where the police had recently received reports of a number of motor vehicle break-ins.  The vehicle was occupied by three men; the defendant was seated in the rear passenger seat.  After Officer Matthews activated his cruiser's blue lights, and before the vehicle came to a stop, he observed the three men moving in a manner that heightened his suspicion.  After a backup unit arrived, the three men were ordered out of the vehicle and a patfrisk was conducted of the defendant, which revealed a stun gun in his pants pocket.  Officer Matthews seized the weapon and placed the defendant under arrest for possession of a stun gun.  During a subsequent search of the vehicle, the police recovered a firearm and a loaded extended grip magazine in the back seat, near where the defendant had been seated.  The defendant was charged in a criminal complaint with possession of a stun gun, as well as with carrying a firearm without a license, in violation of G. L. c. 269, § 10 (a); carrying a loaded firearm without a license, in violation of G. L. c. 269, § 10 (n); and possession of a firearm

without a firearm identification card, in violation of G. L. c. 269, § 10 (h).

The defendant moved to dismiss the stun gun charge, arguing that § 131J's criminal prohibition of the possession of stun guns by civilians violates the Second Amendment, citing the Supreme Court's opinion in Caetano II. The judge denied the motion without explanation, and also denied the defendant's request for written findings of fact and rulings of law. After the defendant petitioned for relief from the single justice pursuant to G. L. c. 211, § 3, and the Commonwealth joined the petition, the single justice reserved and reported the petition to the full court.

Discussion. A stun gun, as defined in § 131J, is "a portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill."[1] A stun gun is not a "firearm," which, as defined in

---

[1] General Laws c. 140, § 131J, provides:

"No person shall possess a portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill, except: (1) a [F]ederal, [S]tate or municipal law enforcement officer, or member of a special reaction team in a [S]tate prison or designated special operations or tactical team in a county correctional facility, acting in the discharge of his official duties who has completed a training course approved by the secretary of public safety

in the use of such a devise or weapon designed to incapacitate temporarily; or (2) a supplier of such devices or weapons designed to incapacitate temporarily, if possession of the device or weapon is necessary to the supply or sale of the device or weapon within the scope of such sale or supply enterprise.  No person shall sell or offer for sale such device or weapon, except to [F]ederal, [S]tate or municipal law enforcement agencies.  A device or weapon sold under this section shall include a mechanism for tracking the number of times the device or weapon has been fired.  The secretary of public safety shall adopt regulations governing who may sell or offer to sell such devices or weapons in the [C]ommonwealth and governing law enforcement training on the appropriate use of portable electrical weapons.

"Whoever violates this section shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment in the house of correction for not less than [six] months nor more than [two and one-half] years, or by both such fine and imprisonment.  A law enforcement officer may arrest without a warrant any person whom he has probable cause to believe has violated this section."

As is apparent, § 131J does not use the term "stun gun." But G. L. c. 269, § 12F, a statute pertaining to airport secure areas, defines a "[p]rohibited weapon" as, among other things, "any stun gun as defined in [G. L. c. 140, § 131J]."  The two most well-known electrical weapons that fall within the rubric of § 131J are stun guns and "dart-firing electrical shock device[s]," better known as Tasers.  See American Civil Liberties Union of Massachusetts, Less Lethal Force:  Proposed Standards for Massachusetts Law Enforcement Agencies, at 5, https://aclum.org/wp-content/uploads/2015/06/reports-less-lethalforce.pdf [https://perma.cc/F29X-XHWH].  Tasers use "compressed nitrogen gas to fire two wires tipped with electrical barbs at [a person]," and, "[w]hen the barbs penetrate [a person's] skin or clothing, an electrical signal is transmitted through the wires, resulting in a paralyzing and incapacitating electrical shock."  Id. at 6.  In contrast to Tasers, stun guns have the electrodes attached to the device, and, when this "charged portion of the stun gun" comes into direct contact with a person's skin or clothing, it "completes an electrical circuit and delivers an incapacitating shock to [the person]."  Id. at 5-6.  For the sake of simplicity, we refer to all electrical weapons under § 131J as "stun guns."

G. L. c. 140, § 121, is a weapon "from which a shot or bullet can be discharged," among other requirements.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In Heller, 554 U.S. at 635, the Supreme Court held that "the District [of Columbia's] ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."  Noting that "the inherent right of self-defense has been central to the Second Amendment right," the Court declared:

> "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose.  The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute.  Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' . . . would fail constitutional muster" (footnote and citation omitted).

Id. at 628-629.

Although there was no dispute that the firearm at issue in Heller was an "arm" under the Second Amendment, the Court addressed the meaning of the term "arm."  The Court noted that "[t]he 18th-century meaning is no different from the meaning today," and offered two definitions of the word from legal

dictionaries written shortly before the enactment of the Second Amendment.  Id. at 581.  The first, in the 1773 edition of Samuel Johnson's dictionary, defined "arms" as "[w]eapons of offence, or armour of defence."  Id., quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978).  The second, in Timothy Cunningham's 1771 legal dictionary, defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." Heller, supra at 581, quoting 1 A New and Complete Law Dictionary.  The Court characterized the argument "that only those arms in existence in the 18th century are protected by the Second Amendment" as "bordering on the frivolous," declaring that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  Heller, supra at 582.  It also noted that "[t]he term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity."  Id. at 581.

    The Court, however, made clear that "the right secured by the Second Amendment is not unlimited," and "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Id. at 626.  The Court recognized two important limitations on the right to keep and carry arms. First, the Court declared, "Although we do not undertake an

exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-627. Second, the Court recognized that there was a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" (citations omitted). Id. at 627. The Court declared that this historical tradition was supported by the limitation explained in United States v. Miller, 307 U.S. 174, 179 (1939), "that the sorts of weapons protected [under the Second Amendment] were those 'in common use at the time.'" Heller, supra, quoting Miller, supra at 179. However, a few pages earlier in the Heller opinion, the Court had stated that it "read Miller to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." Heller, supra at 625.

In Caetano I, we considered whether a ban on civilian stun gun possession under § 131J violated the Second Amendment, where

the possession was outside the home.[2]  The defendant had been arrested after a police officer found a stun gun in her purse while she was seated in her vehicle in the parking lot of a supermarket.  See Caetano I, 470 Mass. at 775.  The defendant told police that she carried the stun gun for self-defense against a former boy friend.  See id.  She moved to dismiss the complaint, arguing that her possession of the stun gun was protected by the Second Amendment because a stun gun is an "arm" for purposes of the Second Amendment, is a weapon used primarily for self-defense, and is in common use in the United States for that purpose.  Id. at 775-776.  We affirmed the denial of the motion to dismiss as well as her subsequent conviction, concluding, "Without further guidance from the Supreme Court on the scope of the Second Amendment, we do not extend the Second Amendment right articulated by Heller to cover stun guns."  Id. at 779, 783.

We noted that "[t]he conduct at issue in [that] case falls outside the 'core' of the Second Amendment, insofar as the defendant was not using the stun gun to defend herself in her home, . . . and involves a 'dangerous and unusual weapon' that was not 'in common use at the time' of enactment."  Id. at 779. We determined that a stun gun was a "per se dangerous weapon at

---

[2] The defendant in that case testified that she was homeless but temporarily residing in a hotel.  See Commonwealth v. Caetano, 470 Mass. 774, 776 (2015).

common law," id. at 780, because its purpose was solely for "bodily assault or defense."  Id., quoting Commonwealth v. Appleby, 380 Mass. 296, 303 (1980).  We also determined that a stun gun was "unusual" because it was not "in common use at the time" the Second Amendment was enacted, Caetano I, supra at 780-781, and was also an "unusual weapon" in terms of the number of persons who own them (as compared to firearms) and in terms of its use (in that it is not readily adaptable to use in the military and is ineffective for hunting and target shooting). Id. at 781.

The Supreme Court granted certiorari, vacated the judgment, and remanded the case for further proceedings.  In a per curiam decision, the Supreme Court declared:

> "The [Supreme Judicial] [C]ourt offered three explanations to support its holding that the Second Amendment does not extend to stun guns.  First, the court explained that stun guns are not protected because they 'were not in common use at the time of the Second Amendment's enactment.'  [Caetano I, 470 Mass. at 781]. This is inconsistent with Heller's clear statement that the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding.'  [554 U.S. at 582].

> "The court next asked whether stun guns are 'dangerous per se at common law and unusual,' [Caetano I, 470 Mass. at 781], in an attempt to apply one 'important limitation on the right to keep and carry arms,' [Heller, 554 U.S. at 627.  See id.] (referring to 'the historical tradition of prohibiting the carrying of "dangerous and unusual weapons"').  In so doing, the court concluded that stun guns are 'unusual' because they are 'a thoroughly modern invention.'  [Caetano I, supra].  By equating 'unusual' with 'in common use at the time of the Second Amendment's

enactment,' the court's second explanation is the same as the first; it is inconsistent with Heller for the same reason.

"Finally, the court used 'a contemporary lens' and found 'nothing in the record to suggest that [stun guns] are readily adaptable to use in the military.' [Caetano I, 470 Mass. at 781]. But Heller rejected the proposition 'that only those weapons useful in warfare are protected.' [554 U.S. at 624-625].

"For these three reasons, the explanation the . . . court offered for upholding the law contradicts this Court's precedent."

Caetano II, 136 S. Ct. at 1027-1028. The Supreme Court did not opine as to whether electrical weapons are protected under the Second Amendment or, if they are protected, whether § 131J is nonetheless constitutional.[3]

Having received guidance from the Supreme Court in Caetano II, we now conclude that stun guns are "arms" within the protection of the Second Amendment. Therefore, under the Second Amendment, the possession of stun guns may be regulated, but not absolutely banned. Restrictions may be placed on the categories of persons who may possess them, licenses may be required for their possession, and those licensed to possess them may be

---

[3] In a concurrence joined by Justice Thomas, Justice Alito expressed his view that electrical weapons are protected by the Second Amendment and that Massachusetts's "categorical ban of such weapons therefore violates the Second Amendment." Caetano v. Massachusetts, 136 S. Ct. 1027, 1028-1033 (2016) (Alito, J., concurring in the judgment). Justice Alito also stressed that this court's decision did "a grave disservice to vulnerable individuals like [the defendant] who must defend themselves because the State will not." Id. at 1029.

barred from carrying them in sensitive places, such as schools and government buildings.  But the absolute prohibition in § 131J that bars all civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and is therefore unconstitutional.

Having so found, we must now decide whether § 131J is facially invalid and therefore must be struck down in its entirety, or whether it is only partially invalid and can be narrowed in its application to preserve its constitutionality. When confronting a constitutional flaw in a statute, a court strives "to limit the solution to the problem."  Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 328 (2006). As part of limiting the solution to the problem, a court may choose to "enjoin only the unconstitutional applications of a statute while leaving other applications in force, see United States v. Raines, 362 U.S. 17, 20-22 (1960), or to sever its problematic portions while leaving the remainder intact, United States v. Booker, 543 U.S. 220, 227-229 (2005)."  Ayotte, supra at 328-329.  See generally Free Enter. Fund v. Public Co. Accounting Oversight Bd., 561 U.S. 477, 508-509 (2010).

In Ayotte, supra at 329-330, the Supreme Court identified three "interrelated principles" that should inform a court's approach when it confronts a constitutional flaw in a statute. First, a court should "try not to nullify more of a

legislature's work than is necessary, for . . . '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" Id. at 329, quoting Regan v. Time, Inc., 468 U.S. 641, 652 (1984) (plurality opinion). See Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 451 (2008) ("facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the [United States] Constitution"). "Accordingly, the 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'" Ayotte, supra, quoting Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 504 (1985).

Second, "mindful that our constitutional mandate and institutional competence are limited," a court should restrain itself from "'rewrit[ing] [S]tate law to conform it to constitutional requirements[,]' even as [a court] strive[s] to salvage it." Ayotte, supra at 329, quoting Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 397 (1988). A court's "ability to devise a judicial remedy that does not entail quintessentially legislative work often depends on how clearly [the court has] already articulated the background

constitutional rules at issue and how easily [it] can articulate the remedy." Ayotte, supra.

Third, "the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'" Id. at 330, quoting Califano v. Westcott, 443 U.S. 76, 94 (1979) (Powell, J., concurring in part and dissenting in part). "After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?" Ayotte, supra.

Applying these three "interrelated principles," we are confident that the Legislature would prefer partial invalidation to facial invalidation if the scope of the stun gun statute could be narrowed without the "quintessentially legislative work" of rewriting State law. See Ayotte, 546 U.S. at 329. Although stun guns, like handguns, are weapons "typically possessed by law-abiding citizens for lawful purposes," see Heller, 554 U.S. at 625, stun guns, like handguns, are weapons that can injure or kill and, in the wrong hands, can be used for many unlawful or reckless purposes. An electrical device or weapon falls within the prohibition of § 131J only if the electrical current, impulse, wave, or beam it emits "is designed

to incapacitate temporarily, injure or kill."[4]  G. L. c. 140,
§ 131J.  As we noted in Caetano I, "stun guns deliver a charge
of up to 50,000 volts," and "are designed to incapacitate a
target by causing disabling pain, uncontrolled muscular
contractions, and general disruption of the central nervous
system."  Caetano I, 470 Mass. at 782, citing Amnesty
International, Less than Lethal?  Use of Stun Weapons in U.S.
Law Enforcement, 1-2, 6-7 & nn.17, 18 (2008), https://www
.amnesty.org/download/Documents/52000/amr510102008en.pdf
[https://perma.cc/JK53-XMR3].

Our appellate case law reveals that stun guns have been
used to incapacitate a victim before killing him by
strangulation, see Commonwealth v. Williams, 475 Mass. 705, 713
(2016) (victim "was assaulted repeatedly with a stun gun and
eventually strangled to death"); to assault victims to force
them to submit to unwanted sexual intercourse, see Commonwealth
v. Gomes, 54 Mass. App. Ct. 1, 2 (2002) ("The assailant drove
the complainants to a remote area . . . , displayed a stun gun,

---

[4] Axon Enterprise, Inc. (formerly known as TASER
International, Inc., until April, 2017), the leading
manufacturer of stun guns, notes that its conducted electrical
weapon products, including stun guns, "are often used in
aggressive confrontations that may result in serious, permanent
bodily injury or death to those involved" and that its "products
may be associated with these injuries."  See Axon Enterprise,
Inc., United States Securities and Exchange Commission Form 10-
K, 2017 Annual Report, at 15, https://www.sec.gov/Archives/edgar
/data/1069183/000106918318000020/a10kaaxn123117.htm [https://
perma.cc/Y3WY-SPKR].

and forced them to have sex with him"); and to punish and control victims of domestic violence, see Commonwealth v. Melton, 77 Mass. App. Ct. 552, 553 (2010) (victim, who "suffered frequent beatings, threats of violence and sexual abuse, and continuous emotional intimidation," "testified that the defendant had used various weapons against her, such as a knife, stun gun, and belt, and detailed certain incidents of abuse"). Although less lethal than a handgun, stun guns can be used to conceal the torture and abuse of another person because they "can deliver repeated or prolonged shocks without leaving marks." Caetano I, 470 Mass. at 782, citing Amnesty International, supra at 1-2. See Turner & Jumbelic, Stun Gun Injuries in the Abuse and Death of a Seven-Month-Old Infant, 48 J. Forensic Sci. 1 (2003).

The Legislature was so concerned with the risk of their misuse that, in 1986, it initially barred all individuals, including law enforcement officers, from possessing electrical weapons. See G. L. c. 140, § 131J, inserted by St. 1986, c. 212. In 2004, the Legislature amended the law to its current form, which continues to bar civilian possession of stun guns, but exempts law enforcement officers from the ban when using electrical weapons in the discharge of their official duties as well as those who supply these weapons to law enforcement

officers.  See G. L. c. 140, § 131J, as amended by St. 2004, c. 170, § 1.

We recognize that declaring § 131J to be facially invalid would leave in place no restriction on stun gun possession by anyone in Massachusetts.  Unless and until the Legislature were to act to replace § 131J with a revised version that would pass muster under the Second Amendment, facial invalidation of § 131J would mean that there would be no law in place preventing stun guns from being sold to or possessed by violent felons, persons convicted of domestic violence, convicted drug dealers, children, or the mentally ill.  But, having carefully considered whether the scope of the stun gun statute could be narrowed to render it constitutional without the "quintessentially legislative work" of rewriting State law, see Ayotte, 546 U.S. at 329, we have reluctantly come to the conclusion that it cannot be saved.

We are mindful that the Legislature has expressly adopted the principle of severability of statutory provisions.  See G. L. c. 4, § 6, Eleventh, inserted by St. 1983, c. 210 ("The provisions of any statute shall be deemed severable, and if any part of any statute shall be adjudged unconstitutional or invalid, such judgment shall not affect other valid parts thereof").  Where a provision of a statute is held unconstitutional, "the valid portions of the statute should be

preserved if the invalid provision is separable from the remainder of the statute." Commonwealth v. Brown, 466 Mass. 676, 681 (2013). But, where § 131J provides that, apart from law enforcement officers and suppliers, "[n]o person shall possess a [stun gun]," there is no provision that can be severed to save its constitutionality. The invalid provision here is "[n]o person," and the statute does not make sense if that provision were severed.

We also recognize that the Supreme Court in Heller made clear that the Second Amendment does not prevent a legislature from enacting statutes that prohibit the possession of arms by certain classes of persons who pose a special danger to society, such as felons and the mentally ill. See Heller, 554 U.S. at 626-627. In contrast with the ban on stun guns, the State has not barred all civilian possession of firearms; instead, it has prohibited certain classes of persons from possessing firearms by promulgating licensing requirements. General Laws c. 140, § 129C, mandates that no person "shall own or possess any firearm, rifle, shotgun or ammunition unless he has been issued a firearm identification card" (FID card) under G. L. c. 140, § 129B. And § 129B (1) provides that a person shall be issued an FID card "if it appears that the applicant is not a prohibited person," which includes persons convicted of felonies or adjudicated a youthful offender or delinquent child; persons

convicted of violent crimes (as defined in G. L. c. 140, § 121)
or misdemeanors punishable by imprisonment for more than two
years; persons who have been committed to a hospital or an
institution for mental illness, alcohol, or substance abuse; and
persons under the age of fifteen.  Because presumptively lawful
prohibitions do not burden conduct protected by the Second
Amendment, they fall outside the scope of the Second Amendment
and are not subject to heightened scrutiny.  See Chief of Police
of Worcester v. Holden, 470 Mass. 845, 853 (2015).  See also
Commonwealth v. McGowan, 464 Mass. 232, 240-241 (2013) (we have
"consistently held, without applying any level of heightened
scrutiny, that the decisions in Heller and McDonald [v. Chicago,
561 U.S. 742 (2010),] did not invalidate laws that require a
person to have a[n] [FID] card to possess a firearm in one's
home or place of business").

If the Legislature had made it a crime only for this class
of "prohibited persons" to possess a stun gun (or a comparable
class), there could be no doubt that such a statute would be
constitutional and that it would preserve much of what the
Legislature intended through its broader ban.  But we cannot
ourselves limit the application of § 131J to "prohibited
persons" without engaging in the "quintessentially legislative
work" of rewriting State law.  See Ayotte, 546 U.S. at 329.  We
would first need to decide whether the class of "prohibited

persons" should be the same for the possession of stun guns as for the possession of firearms, which are more lethal than stun guns.  We would then need to decide whether a person must be licensed to possess a stun gun, as is required to possess a firearm.[5]  And if we decided that a license should be required, we would need to consider if we should adopt the same licensing scheme for stun guns as exists for firearms, or some variant of that licensing scheme.

We therefore come to the conclusion that we cannot save § 131J through partial invalidation and must declare it to be facially invalid.  Because this will invalidate the Legislature's absolute ban and leave no lesser restriction on the possession of stun guns in its place, and because we recognize that the Legislature may wish to do what we cannot (revise the statute in a manner that will preserve its constitutionality), we will direct that the entry of the judgment after the date of our issuance of the rescript in this

---

[5] We note that prohibited persons may be barred from possessing a weapon without there being a licensing system. General Laws c. 140, § 122D, prohibits various categories of persons from purchasing or possessing "self-defense spray," which is defined in G. L. c. 140, § 122C (a), to mean "chemical mace, pepper spray or any device or instrument which contains, propels or emits a liquid, gas, powder or other substance designed to incapacitate."  But, unlike with firearms, individuals over the age of eighteen need not be licensed to purchase or possess self-defense spray.  See G. L. c. 140, § 122C (d).  The Legislature simply made it a criminal violation for a person to purchase or possess self-defense spray if he or she is within a category of persons enumerated in § 122D.

case be delayed in order to allow the Legislature adequate time to amend the statute in light of this opinion, if it so chooses. See, e.g., Moot v. Department of Envtl. Protection, 456 Mass. 309, 310 (2010) (in earlier case, Department of Environmental Protection regulation had been declared to be invalid, but court "issued a stay of the entry of judgment after rescript in the Superior Court to permit the Legislature to take any action it might deem appropriate in light of our opinion"); Goodridge v. Department of Pub. Health, 440 Mass. 309, 344 (2003) (marriage licensing statute declared unconstitutional because it could not be construed to permit same-sex couples to marry, but court ordered that "[e]ntry of judgment shall be stayed for 180 days to permit the Legislature to take such action as it may deem appropriate in light of this opinion").

Conclusion. The case is remanded to the county court for entry of a judgment (a) declaring that the absolute prohibition in G. L. c. 140, § 131J, against the civilian possession of stun guns is in violation of the Second Amendment to the United States Constitution, and therefore that § 131J in its current form, as amended by St. 2004, c. 170, § 1, is facially invalid; and (b) vacating the District Court's order denying the defendant's motion to dismiss the charge of unlawfully possessing a stun gun in violation of § 131J, and directing the judge to allow the motion and to dismiss that charge. The entry

of that judgment shall be stayed for sixty days after the date of the issuance of the rescript in this case.  In the meantime, to avoid needless delay in the adjudication of the defendant's remaining criminal charges, the Commonwealth may treat the charge under § 131J as having been dismissed, and may proceed with its prosecution of the remaining charges, without awaiting the entry of the judgment in the county court to that effect.

<u>So ordered</u>.