APPEALS COURT 
 
 COMMONWEALTH vs. MICHAEL SHEHADI

 
 Docket:
 22-P-969
 
 
 Dates:
 January 10, 2024 - November 6, 2024
 
 
 Present:
 Green,[1] C.J., Walsh, & Smyth, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Firearms. Practice, Criminal, Dismissal, Plea. Statute, Construction. Words, "Firearm."
 
 

             Indictments found and returned in the Superior Court Department on February 24, 2022. 
            A motion to dismiss was heard by Michael P. Doolin, J. and a conditional plea of guilty was accepted by him. 
            Matthew Spurlock for the defendant.
            Andrew S. Doherty, Assistant District Attorney, for the Commonwealth.
            SMYTH, J.  The defendant, Michael Shehadi, appeals from so much of an order of a Superior Court judge that denied the defendant's motion to dismiss as to one count of carrying a firearm without a license, in violation of G. L. c. 269, § 10 (a).  The defendant contends that the judge erred because the charge stemmed from his possession of a device that does not meet the statutory definition of a "firearm."  See G. L. c. 140, § 121.  We agree and reverse.
            Background.  At approximately 2:20 A.M., on August 27, 2021, police found the defendant unconscious in the driver's seat of a parked car.  After observing what appeared to be drug paraphernalia in the center console, police searched the cabin of the vehicle and recovered a bag of fentanyl.  Officers obtained a search warrant for the rest of the vehicle, and upon executing it, recovered a SABRE S-1009 stun gun from the trunk.  On February 24, 2022, a grand jury returned indictments charging the defendant with two counts of trafficking fentanyl, in violation of G. L. c. 94C, §§ 32E (c) (2) and 32E (c) (3); one count of carrying a dangerous weapon, to wit, brass knuckles, in violation of G. L. c. 269, § 10 (b); one count of possession of a firearm without a license, in violation of G. L. c. 269, § 10 (a); and one count of possession of a firearm during the commission of a felony (trafficking fentanyl), in violation of G. L. c. 265, § 18B.  Both firearm charges stemmed from the stun gun found in the defendant's trunk.
            The defendant moved to dismiss the firearm charges, arguing, inter alia, that the stun gun recovered from his trunk did not meet the statutory definition of a firearm because it is "constructed in a shape that does not resemble a handgun, short-barreled rifle, or short-barreled shotgun."  See G. L. c. 140, § 121.  A Superior Court judge allowed the motion as to the charge of possession of a firearm during the commission of a felony, but denied the motion as to the charge of carrying a firearm without a license.[2]  
            On September 8, 2022, the parties entered into a plea agreement.  Pursuant to Mass. R. Crim. P. 12 (b) (6), as appearing in 482 Mass. 1501 (2019),[3] the defendant entered a conditional plea of guilty on the charge of carrying a firearm without a license, which preserved his right to appeal from the order denying his motion to dismiss.[4]  We now turn to the merits of that appeal.
            Discussion.  In order to convict the defendant of carrying a firearm without a license, the Commonwealth was required to establish that he "knowingly ha[d] in his possession; or knowingly ha[d] under his control in a vehicle; a firearm, loaded or unloaded, as defined in [G. L. c. 140, § 121,]" without a license issued under G. L. c. 140, §§ 131 or 131F (emphasis added).  G. L. c. 269, § 10 (a).[5]  The defendant does not contest the element of possession.  Rather, the issue presented by the defendant's appeal is limited to whether the stun gun recovered from his trunk is a "firearm" within the meaning of G. L. c. 140, § 121.
            1.  Standard of review.  "We review questions of statutory interpretation de novo" (citation omitted).  Commonwealth v. Martin, 476 Mass. 72, 75 (2016).  "When interpreting a statute, we look first to the 'plain and ordinary meaning' of the statutory language."  Matter of an Impounded Case, 493 Mass. 470, 472 (2024), quoting Velazquez v. Commonwealth, 491 Mass. 279, 281 (2023).  "If the statutory language is clear, we conclude our analysis."  Id.
            2.  Statutory language.  General Laws c. 140, § 121, defines a "firearm" as
"a stun gun[6] or a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot[7] or bullet can be discharged and of which the length of the barrel or barrels is less than [sixteen] inches or [eighteen] inches in the case of a shotgun as originally manufactured; provided, however, that the term firearm shall not include any weapon[8] that is:  (i) constructed in a shape that does not resemble a handgun, short-barreled rifle or short-barreled shotgun including, but not limited to, covert weapons that resemble key-chains, pens, cigarette-lighters or cigarette packages; or (ii) not detectable as a weapon or potential weapon by x-ray machines commonly used at airports or walk-through metal detectors" (emphasis added).
The plain language of § 121 provides an unambiguous definition of what constitutes a firearm by establishing specific criteria that must be met for an object to fall within this classification.  The definition specifically includes stun guns.  The statute also delineates that certain weapons are specifically excluded from classification as firearms based on their appearance by providing that the term firearm "shall not include any weapon that is . . . constructed in a shape that does not resemble a handgun, short-barreled rifle or short-barreled shotgun"[9] (hereinafter, the "appearance-based exemption").  G. L. c. 140, § 121.
            3.  Analysis.  Although both the Commonwealth and the defendant assert that the definition of "firearm" in § 121 is unambiguous, each interprets it differently.  The defendant contends that the stun gun recovered from his vehicle is expressly excepted from the definition by the statute's appearance-based exemption.  G. L. c. 140, § 121.  The Commonwealth does not dispute that the stun gun at issue here, which the defendant describes as resembling "a clunky electrical razor or even a small brick," bears no resemblance to "a handgun, short-barreled rifle or short-barreled shotgun."  G. L. c. 140, § 121.  The Commonwealth nevertheless contends that the statutory scheme and historical context in which "stun gun" was added to the definition demonstrate that the appearance-based exemption does not apply to a stun gun, regardless of its construction, because stun guns are not "gun-type" or "bullet-discharging" weapons.  Otherwise stated, the Commonwealth claims the appearance-based exemption applies only to the portion of § 121's definition of firearm that immediately follows the definition's sole reference to stun guns, describing "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged."
            In addition, the Commonwealth asserts that the Legislature incorporated the appearance-based exemption, which predates the addition of "stun gun," to the "firearm" definition in order to exclude covert weapons that are banned altogether in Massachusetts from the firearm regulatory scheme.  See G. L. c. 140, § 131N.  It thus follows, according to the Commonwealth, that interpreting the appearance-based exemption to exclude "brick-like stun guns" would impermissibly expand the reach of the appearance-based exemption "far beyond covert weapons, essentially reading the list [of covert weapons in the appearance-based exemption] out of the statute.".  We are not persuaded.
            As set forth above, § 121's appearance-based exemption provides that "the term firearm shall not include any weapon" constructed in a shape that does not resemble specified firearms (emphasis added).  G. L. c. 140, § 121.  The definition of "weapon" in § 121 includes "firearm[s]," which in turn includes stun guns.[10]  Thus, reading the definitions of "firearm" and "weapon" together, the appearance-based exception contained in the definition of firearm applies to stun guns.
            In addition, "[r]ead naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind" (quotation and citation omitted).  Bank of N.Y. Mellon v. King, 485 Mass. 37, 46 (2020).  Limiting the application of the appearance-based exemption to "pistols, revolvers," or "bullet-discharging" weapons would not only contradict the plain meaning of the word "any" and ignore the statutory definition of "weapon," but it would also run afoul of the principle "that a statute 'be construed so that effect is given to all its provisions, "so that no part will be inoperative or superfluous."'"  Commonwealth v. Vega, 449 Mass. 227, 231 (2007), quoting Wolfe v. Gormally, 440 Mass. 699, 704 (2004).  See Commonwealth v. Young, 453 Mass. 707, 713 (2009), quoting Collatos v. Boston Retirement Bd., 396 Mass. 684, 687 (1986) (we must presume "that the Legislature intended what the words of the statute say").  Contrast Commonwealth v. Perez Narvaez, 490 Mass. 807, 811 (2022), quoting McCarthy v. Commissioner of Revenue, 391 Mass. 630, 633 (1984) ("the term 'other noxious or filthy substance' may seem clear and unambiguous on its face, but it too, like the term 'any person,' is a general, yet undefined statutory term, the intended meaning of which cannot be fully discerned without going beyond the plain and ordinary meaning of the language of [the statute]").
            A structural analysis of § 121's "firearm" definition further underscores our conclusion that the appearance-based exemption applies to stun guns.  Section 121 initially sets forth a definition of "firearm" that encompasses a broad range of items, including stun guns, and pistols, revolvers, or other weapons meeting specific criteria regarding barrel length and capability of discharging a shot or bullet.  The semicolon following this definition indicates a distinct break in the sentence structure, which, combined with the term "provided, however," signals the introduction of exceptions to the preceding definition.  See Globe Newspaper Co. v. Boston Retirement Bd., 388 Mass. 427, 432 (1983) ("The use of a semicolon usually indicates that each clause is intended to be independent").  While "[i]t is the general rule of statutory as well as grammatical construction that a modifying clause is confined to the last antecedent" (quotation omitted), Moulton v. Brookline Rent Control Bd., 385 Mass. 228, 230-231 (1982), this rule typically applies where "a list of multiple, distinct antecedents precedes the modifying clause," Bednark v. Catania Hospitality Group, Inc., 78 Mass. App. Ct. 806, 812 (2011).  Here, in contrast, there is no list of distinct antecedents preceding the appearance-based exemption but, rather, a multipart definition of the term "firearm."  Although the initial definition lists several different types of firearms, the plain language of the appearance-based exemption focuses on the broader category of objects encompassed within the initial definition, stating that "the term firearm shall not include any weapon" that does not meet the appearance criteria set forth therein.  G. L. c. 140, § 121.  Accordingly, the appearance-based exemption is intended to be applied to all of the items, including stun guns, enumerated in the preceding definition.  See Bednark, supra at 813, quoting Porto Rico Ry., Light & Power Co. v. Mor, 253 U.S. 345, 348 (1920) ("When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all").
            To the extent that the Commonwealth maintains that the appearance-based exemption is applicable only to covert weapons, this assertion is contradicted by the Legislature's insertion of the phrase "including, but not limited to," which immediately precedes the reference to covert weapons.  Moreover, the Commonwealth's suggestion that identical language in the appearance-based exemption and the statute banning covert weapons, G. L. c. 140, § 131N (§ 131N), evidences a legislative intent to limit the exemption to covert weapons does not withstand our examination of § 121.  The Legislature enacted § 131N at the same time it revised § 121 to include the exemption language at issue.  See St. 1998, c. 180, §§ 8, 47.  If the Legislature intended to limit application of the appearance-based exemption to covert weapons only, it is reasonable to infer they would have effectuated that intent by explicitly qualifying "weapon" with "covert," instead of providing for "any weapon" to be subject to the appearance-based exemption.  In the alternative, the Legislature could have cross-referenced § 131N within the "firearm" definition in the same manner it opted to cross-reference statutes within other definitions in § 121.  See, e.g., G. L. c. 140, § 121 (defining "large capacity feeding device," in part, as "a large capacity ammunition feeding device as defined in the [F]ederal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. § 921[a][31]").  The Legislature's decision to replicate the language of § 131N within the "firearm" definition without expressly limiting the exemption to covert weapons as defined in § 131N prevents us from so limiting the exemption.  See Alves's Case, 451 Mass. 171, 179-180 (2008) ("the Legislature is presumed to intend and understand all the consequences of its actions").  Although it has amended § 121 seven times since originally adding the "firearm" definition at issue, the Legislature has not once opted to narrow the exemption's scope.
            For these reasons, we conclude that under the plain language of G. L. c. 140, § 121, a stun gun that "does not resemble a handgun, short-barreled rifle or short-barreled shotgun" is not a "firearm" for purposes of G. L. c. 140, § 121, or G. L. c. 269, § 10 (a).
            4.  Absurdity argument.  The Commonwealth argues that, in light of the circumstances under which the Legislature added stun guns to the definition of "firearm" under G. L. c. 140, § 121, interpreting the definition to exclude certain types of stun guns would produce an "absurd result."  See Dacey v. Burgess, 491 Mass. 311, 314 (2023), quoting Marengi v. 6 Forest Rd. LLC, 491 Mass. 19, 24-25 (2022) ("A fundamental tenet of statutory interpretation is that statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result").  Specifically, the Commonwealth asserts that the Legislature intended to add all types of stun guns to § 121's definition of "firearm" in response to the Supreme Judicial Court's decision in Ramirez v. Commonwealth, 479 Mass. 331, 332-333 (2018).  In Ramirez, the Supreme Judicial Court held that the Commonwealth's absolute ban on civilian possession of electrical weapons violated the Second Amendment to the United States Constitution, and declared the law establishing the ban, G. L. c. 140, § 131J, as amended through St. 2004, c. 170, § 1, facially invalid.  Ramirez, supra at 343.
            The new legislation, enacted four months after the Ramirez decision, amended § 121 to include stun guns in the definition of "firearm."  Contrast G. L. c. 140, § 121, as amended through St. 2017, c. 110, with G. L. c. 140, § 121, as amended through St. 2018, c. 123, §§ 4, 7.  The Commonwealth thus concludes that the Legislature must have intended to include all types of stun guns in the amended definition of "firearm" under § 121, without limit to their appearance.  Accepting this suggested Legislative intent, the Commonwealth argues that the application of the appearance-based clause to stun guns produces an absurd result.
            The Commonwealth has failed to connect any legislative history or actions to its assertion that the Legislature sought to classify all stun guns as firearms when modifying G. L. c. 140, § 121, in response to Ramirez.  The speculative nature of the Commonwealth's absurdity argument is particularly evident in view of the significant disparity, prior to Ramirez, in penalties for unlawfully carrying a firearm and unlawfully carrying a stun gun.  Prior to the Ramirez decision, G. L. c. 269, § 10, prescribed a mandatory minimum sentence of eighteen months in a house of correction for unlawfully carrying a firearm.  In contrast, before Ramirez invalidated the Commonwealth's absolute ban on stun guns, § 131J prescribed "a fine of not less than $500 nor more than $1,000 or by imprisonment in the house of correction for not less than [six] months nor more than [two and one-half] years, or by both such fine and imprisonment."  See G. L. c. 140, § 131J, as amended through St. 2004, c. 170, § 1.  The stark disparity in penalties -- the possibility of a mere fine for carrying a stun gun and a mandatory minimum of eighteen months in the house of correction for unlawfully carrying a firearm -- suggests that the Legislature did not equate all stun guns with firearms prior to Ramirez, thus undermining the Commonwealth's argument that the Legislature necessarily intended to regulate all stun guns in the same manner as other weapons once the Supreme Judicial Court declared the statute banning them altogether facially invalid.
            To the extent the Legislature did, in fact, intend to prescribe more severe penalties for carrying stun guns that closely resemble conventional firearms, we observe that this determination could be viewed as a reasonable and measured response to address legitimate concerns related to public safety and law enforcement.  Stun guns that fall within the "firearm" definition function more like conventional firearms and may reasonably be perceived to present a greater risk to the target than the type of stun gun that requires physical contact with skin or clothing to produce a shock.[11]  
            Additionally, stun guns that closely resemble conventional firearms may pose a higher risk of being mistaken for lethal weapons and escalating situations where members of the public or law enforcement perceive a threat.  See McLaughlin v. United States, 476 U.S. 16, 17-18 (1986) ("the display of a gun instills fear in the average citizen; as a consequence, it creates an immediate danger that a violent response will ensue" [footnote omitted]); Commonwealth v. Henson, 357 Mass. 686, 693 (1970) ("the public peace and order is affected by and dependent upon what is reasonably apparent, and not upon secret fact or reason rendering the assailant incapable of accomplishing the battery.  [This reasoning] applies with even greater force to a case of apparent ability to accomplish a battery attempted or threatened by means of a firearm").  See also United States v. Benson, 918 F.2d 1, 3 (1st Cir. 1990) ("The dangerousness of an instrumentality . . . is not necessarily determined simply by its inherent capacity to inflict harm, but by the dangerousness of the response it may reasonably be expected to provoke on the part of persons who perceive that the instrumentality is dangerous"); Commonwealth v. Johnson, 27 Mass. App. Ct. 746, 749 (1989) ("Reasonable apprehension that the defendant . . . was armed with a gun . . . provoked [property owner] to produce his own weapon and to shoot [defendant], as well as to cause a melee and gunfire in a restaurant during business hours").
            We further note that the 2018 legislation also replaced G. L. c. 140, § 131J, with new language that exempted stun guns from certain provisions of the Commonwealth's firearm licensing laws and directed the Secretary of Public Safety and Security to "promulgate regulations restricting access or use of stun guns by non-licensed persons and establishing minimum safety and quality standards, safe storage requirements, education and safety training requirements and law enforcement training on the appropriate use of stun guns."  See St. 2018, c. 123, § 13.  In view of this directive, the legislative exclusion of stun guns that do not resemble conventional firearms from firearm classification under § 121 does not mean that such weapons shall be exempt from regulation altogether.  Rather, these types of stun guns are still subject to regulation by the Secretary of Public Safety and Security pursuant to the secretary's authority under § 131J.[12]  
            For these reasons, we conclude that interpreting the definition of "firearm" to exclude stun guns that do not resemble conventional firearms does not "achieve an illogical result."[13]  Dacey, 491 Mass. at 314, quoting Marengi, 491 Mass. at 24-25.
            5.  Conclusion.  The order denying the defendant's motion to dismiss is reversed as to the charge of unlawfully carrying a firearm, G. L. c. 269, § 10(a).  The matter is remanded to the Superior Court where the guilty plea on that charge shall be vacated and set aside and judgment shall enter for the defendant on that offense.  The remaining orders entered pursuant to the plea agreement are affirmed.  The defendant shall be resentenced accordingly.
So ordered.  
 
footnotes

 
            [1] Chief Justice Green participated in the deliberation on this case prior to his retirement.
            [2] The defendant's motion asserted that the statute criminalizing possession of a firearm during the commission of a felony, G. L. c. 265, § 18B, and the statute criminalizing carrying a firearm without a license, G. L. c. 269, § 10 (a), employ distinct definitions of the word "firearm" that exclude stun guns such as the one recovered from his trunk.  The Commonwealth did not oppose this argument with respect to the "firearm" definition applicable to G. L. c. 265, § 18B, and assented to the dismissal of the charge of possession of a firearm during the commission of a felony.  
            [3] The rule provides, in relevant part, that "[w]ith the written agreement of the prosecutor, the defendant may tender a plea of guilty or an admission to sufficient facts while reserving the right to appeal any ruling or rulings that would, if reversed, render the Commonwealth's case not viable on one or more charges."  Mass. R. Crim. P. 12 (b) (6).
            [4] Under the same plea agreement, the Commonwealth agreed to reduce the trafficking charges to possession of a class A substance with the intent to distribute, G. L. c. 94C, § 32 (a).  The defendant's guilty plea was not conditional as to either the reduced charges or the charge of carrying a dangerous weapon (to wit, brass knuckles).  
            [5] General Laws c. 269, § 10 (a), sets forth several exemptions to the license requirement including, among others, exemptions for persons "present in or on his residence or place of business" and nonresidents visiting the Commonwealth to hunt or participate in certain firearm exhibitions.  See G. L. c. 269, § 10 (a); G. L. c. 140, § 131G.  None of the exemptions to the license requirement is relevant here.
            [6] General Laws c. 140, § 121, separately defines a "stun gun" as "a portable device or weapon, regardless of whether it passes an electrical shock by means of a dart or projectile via a wire lead, from which an electrical current, impulse, wave or beam that is designed to incapacitate temporarily, injure or kill may be directed."  We discern nothing in the definition of "stun gun" itself that bears on whether the appearance-based exemption to the definition of "firearm" (see infra) applies to stun guns.
            [7] Although "shot" is not defined for purposes of G. L. c. 140, § 121, the Merriam-Webster Online dictionary defines it as "something propelled by shooting."  Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/shot [https://perma.cc/JBW7-QZD4].  Not all stun guns operate by a shooting mechanism.  See Ramirez v. Commonwealth, 479 Mass. 331, 333 n.1 (2018).  The record of this case is not sufficiently developed as to whether the stun gun at issue is capable of shooting.  Because we conclude on other grounds that the stun gun at issue is not a firearm for the purposes of G. L. c. 140, § 121, we need not consider whether it also fails to meet the criteria to be classified as a firearm because it is not a weapon from which a shot "can be discharged."
            [8] General Laws c. 140, § 121, separately defines "weapon" as "any rifle, shotgun or firearm."  Although § 121 states that its definitions apply to § 122 through § 131Y of chapter 140 -- a range that does not include § 121 itself -- it is a well-established principle of statutory construction that "[w]hen the Legislature uses the same term in the same section . . . , the term should be given a consistent meaning throughout."  DiCarlo v. Suffolk Constr. Co., 473 Mass. 624, 630 (2016), quoting Commonwealth v. Hilaire, 437 Mass. 809, 816 (2002).  
            [9] The parties have not set forth any argument concerning the applicability of the second exception in G. L. c. 140, § 121's "firearm" definition, which excludes any weapon that is "not detectable as a weapon or potential weapon by x-ray machines commonly used at airports or walk-through metal detectors."  G. L. c. 140, § 121.
            [10] Even if the Legislature intended to use a definition of "weapon" consistent with common usage rather than the statutory definition, the Merriam-Webster Online dictionary defines "weapon" as (1) "something (such as a club, knife, or gun) used to injure, defeat, or destroy or (2) "a means of contending against another," and defines "stun gun" as a "weapon designed to stun or immobilize (as by electric shock) rather than kill or injure the one affected."  Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/stun%20gun [https://perma.cc/RWK7-TJ2U].  Under these definitions, a stun gun is a weapon.
            [11] For instance, the design of a stun gun that operates only upon contact with the victim's skin or clothing limits the possible distance between a user and his victim, thereby creating a close-range confrontation.  By contrast, a Taser-like weapon is a "dart-firing electrical shock device," Ramirez, 479 Mass. at 333 n.1, and may be viewed as more dangerous because it can be used from a distance.  See Caetano v. Massachusetts, 577 U.S. 411, 415 (2016).  The darts fired from a Taser also deliver a more powerful shock than the shock delivered when an electrical weapon needs to be placed in direct contact with a victim's skin or clothing.  See Mattos v. Agarano, 661 F.3d 433, 443 (9th Cir. 2011), cert. denied 566 U.S. 1021 (2012), quoting Bryan v. MacPherson, 630 F.3d 805, 824 (9th Cir. 2010) (when Taser is deployed in "dart-mode" it "uses compressed nitrogen to propel a pair of 'probes' -- aluminum darts tipped with stainless steel barbs connected to the [Taser] by insulated wires -- toward the target at a rate of over 160 feet per second," which, upon striking a victim, delivers an electrical charge that "instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless"; in contrast, where a Taser is used in "drive-stun mode," which requires the user to push electrical contacts located on the device directly against the victim's skin or clothing, "the [T]aser delivers [a painful] electric shock . . . but it does not cause an override of the victim's central nervous system as it does in dart-mode").  Darts fired from Tasers, like bullets fired from a gun, can also become lodged in a victim's flesh.  See Bryan, 630 F.3d at 824 ("barbed probe lodged in [plaintiff's] flesh, requiring hospitalization so that a doctor could remove the probe with a scalpel").
            [12] We note that the Secretary of Public Safety and Security did not promulgate any regulations governing lawful civilian possession of stun guns until January 6, 2023.  See 501 Code Mass. Regs. §§ 8.00-8.09 (2023).  Therefore, as of August 27, 2021, i.e., the date of the defendant's arrest, there was no way for him to obtain a license to carry a stun gun, let alone obtain a license to carry a stun gun pursuant to G. L. c. 140, §§ 131 or 131F, as G. L. c. 269, § 10 (a), expressly requires.  Charging the defendant for failure to possess a license that was not accessible to any civilian at that time parallels the outright ban on stun guns deemed unconstitutional in Ramirez, 479 Mass. at 337-338.
            [13] If the Commonwealth is correct in its belief that the Legislature intended to accomplish something other than what is described in the words they included in the statute, it is open to the Legislature to amend the statute; it is not our role as a court to either rewrite the statute or to supply words the Legislature did not.