NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11718

COMMONWEALTH  vs.  JAIME CAETANO.


Middlesex.      December 2, 2014. - March 2, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Firearms.  Constitutional Law, Right to bear arms.  Self-
    Defense.  Practice, Criminal, Indictment placed on file.



Complaint received and sworn to in the Framingham Division
of the District Court Department on September 30, 2011.

A motion to dismiss was heard by Robert V. Greco, J.; the
case was heard by Martine G. Carroll, J., and a motion for
sentencing was considered by her.

The Supreme Judicial Court granted an application for
direct appellate review.


Benjamin H. Keehn, Committee for Public Counsel Services,
for the defendant.
Michael A. Kaneb, Assistant District Attorney, for the
Commonwealth.
Keith G. Langer, for Commonwealth Second Amendment, amicus
curiae, submitted a brief.
Eugene Volokh, of California, Michael E. Rosman & Michelle
A. Scott, of the District of Columbia, & Lisa J. Steele, for
Arming Women Against Rape & Endangerment, amicus curiae,
submitted a brief.

SPINA, J.  The defendant, Jaime Caetano, asks us to interpret the holdings of the United States Supreme Court in McDonald v. Chicago, 561 U.S. 742, 791 (2010), and District of Columbia v. Heller, 554 U.S. 570, 635 (2008), to afford her a right under the Second Amendment to the United States Constitution to possess a stun gun in public for the purpose of self-defense.  The defendant was arrested for possession of a stun gun in a supermarket parking lot, claiming it was necessary to protect herself against an abusive former boy friend.  She now challenges the constitutionality of G. L. c. 140, § 131J, which bans entirely the possession of an electrical weapon with some exceptions not applicable here.  We hold that a stun gun is not the type of weapon that is eligible for Second Amendment protection, see Heller, supra at 622, and we affirm the defendant's conviction.[1]

1.  Background.  At approximately 3 P.M. on September 29, 2011, Ashland police officers responded to a call about a possible shoplifting at a supermarket.  The manager of the supermarket had detained someone in the store, and he informed police that the defendant and a man with whom she left the store also may have been involved.  The manager pointed to a man standing next to a motor vehicle in the parking lot outside the

---

[1] We acknowledge the amicus briefs submitted by Commonwealth Second Amendment and Arming Women Against Rape & Endangerment in support of the defendant.

supermarket.  The defendant was seated in the vehicle.  Officers approached it.  Following a conversation with officers, the defendant consented to a search of her purse.  Inside the purse, the defendant had an operational stun gun.[2]  The defendant told police that the stun gun was for self-defense against a former boy friend.  Police charged her with possession of a stun gun in violation of G. L. c. 140, § 131J.[3]

The defendant challenged the constitutionality of § 131J in a pretrial motion to dismiss.  She argued that the stun gun is an "arm" for purposes of the Second Amendment, that it is a weapon primarily for self-defense and in common use in the United States for that purpose, and that she kept her stun gun for purposes of self-defense.  As such, she argued that her

---

[2] The stun gun was a black electronic device with two metal prongs and a switch.  Once the switch was thrown, an electrical current appeared between the prongs.  Stun guns are designed to stun a person with an electrical current after the prongs are placed in direct contact with the person and the switch is thrown.

[3] General Laws c. 140, § 131J, forbids the private possession of a "portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill" except by specified public officers or suppliers of such devices, if possession is "necessary to the supply or sale of the device or weapon" to agencies utilizing it.  Violation of this section is punishable "by a fine of not less than $500 nor more than $1,000 or by imprisonment in the house of correction for not less than [six] months nor more than [two and one-half] years, or by both such fine and imprisonment."  Id.

possession of the stun gun was protected by the Second Amendment. The motion was denied.

At a jury-waived trial, the parties stipulated that the device in question was a stun gun regulated by G. L. c. 140, § 131J. The defendant testified that the stun gun was for self-defense against a former boy friend. She further testified that her former boy friend was violent, and that previously she had displayed the stun gun during a confrontation with him. She said that she had been homeless and living in a hotel. The judge found the defendant guilty of possession of the stun gun and placed the case on file. The defendant consented to having the case placed on file. Approximately two and one-half months later the defendant filed a written objection to the case being placed on file, and she moved for sentencing.

A hearing was held on the motion. The Commonwealth recommended the imposition of the minimum fine. The defendant proposed a fine less than the minimum. Both the Commonwealth and the judge recognized that the purpose of the hearing was to preserve the defendant's right of appeal. After discussion, the judge again placed the case on file over the defendant's objection in the belief that this action would preserve the defendant's right of appeal.

The defendant filed a timely notice of appeal. We granted her application for direct appellate review.

2. _Appellate jurisdiction_.  As an initial matter, the Commonwealth argues that this appeal is not properly before the court.  The basis of this argument is that no judgment resulted from the defendant's conviction because a conviction placed on file is not a judgment from which an appeal may be taken.  Generally, a judgment in a criminal case is the sentence, and a defendant has no right of appeal until after the sentence is imposed.  See Commonwealth v. Ford, 424 Mass. 709, 713 n.2 (1997) (conviction placed on filed suspends defendant's right to appeal alleged error in proceeding); Commonwealth v. Delgado, 367 Mass. 432, 438 (1975) (no appeal until after judgment "which in criminal cases is the sentence").  See also Mass. R. Crim. P. 28 (e), 453 Mass. 1501 (2009) (court may file case after guilty verdict without imposing sentence).

We have recognized that a defendant has a right to appeal a conviction on file without her consent.  Delgado, supra.  It was clear to all involved that the defendant wanted to pursue an appeal on the constitutionality of the criminal statute of which she was adjudged guilty, and that she withdrew her consent and moved for sentencing for that purpose.  We conclude that the defendant may proceed with her appeal.  See id.

3. _Discussion_.  Where we must determine whether the Massachusetts ban on stun guns violates the Second Amendment, we are bound by decisions of the United States Supreme Court on the

matter. The Supreme Court recently interpreted the Second Amendment in a historical context that focused on the meaning of various words and phrases in the amendment as they probably were understood and used by Congress at the time of the Second Amendment's enactment. In accord with that analysis we must determine whether a stun gun is the type of weapon contemplated by Congress in 1789 as being protected by the Second Amendment.

In Heller, 554 U.S. at 635, the United States Supreme Court held that "[a] ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." The Court in Heller was confronted with a total ban on handgun possession in the home, and a further requirement that any lawful firearm kept in the home be rendered inoperable. Id. at 628. The Court reasoned that

> "the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' . . . would fail constitutional muster." (Footnote omitted; emphasis added.)

Id. at 628-629, quoting Parker v. District of Columbia, 478 F.3d 370, 400 (D.C. Cir. 2007). The Supreme Court extended this interpretation of the Second Amendment to the States in

McDonald, 561 U.S. at 791. The defendant now urges that the outright prohibition on the private possession of stun guns in Massachusetts violates the right articulated in Heller.[4]

"Since Heller, '[c]ourts have consistently recognized that Heller established that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment.'" Commonwealth v. McGowan, 464 Mass. 232, 235 (2013), quoting Hightower v. Boston, 693 F.3d 61, 72 (1st Cir. 2012). Moreover, the Supreme Court said in Heller that the Second Amendment individual right to keep and bear arms is "not unlimited." 554 U.S. at 595. The Court identified certain examples of lawful prohibitions and limitations on the Second Amendment right including, but not limited to, "prohibitions on the possession of firearms by felons and the mentally ill." Id. at 626. In addition to the lawfulness of prohibitions against possession of arms by certain persons, the Court recognized the existence of

---

[4] At issue here is only the applicability of the Second Amendment to the statute. The cognate Massachusetts constitutional provision, art. 17 of the Massachusetts Declaration of Rights, previously has been held to encompass a collective, and not an individual, right to bear arms. See Commonwealth v. Davis, 369 Mass. 886, 888 (1976). The Heller Court, before reaching its conclusion, first conducted a survey of Second Amendment jurisprudence. District of Columbia v. Heller, 554 U.S. 570, 576-628 (2008). In so doing, the Court concluded that the Second Amendment secured an individual right to bear arms for defensive purposes. Id. at 602. We therefore view the defendant's claim only through the lens of the Second Amendment.

>"another important limitation on the right to keep and carry arms. [United States v.] Miller said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.' . . . We think that limitation is fairly supported by the historical tradition of prohibiting carrying of 'dangerous and unusual weapons.'"

Heller, supra at 627, quoting United States v. Miller, 307 U.S. 174, 179 (1939).

The conduct at issue in this case falls outside the "core" of the Second Amendment, insofar as the defendant was not using the stun gun to defend herself in her home, see Hightower 693 F.3d at 72 & n.8, quoting Heller, 554 U.S. at 627, and involves a "dangerous and unusual weapon" that was not "in common use at the time" of enactment. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Heller, supra at 626. Without further guidance from the Supreme Court on the scope of the Second Amendment, we do not extend the Second Amendment right articulated by Heller to cover stun guns.

Here, we are concerned not with ensuring that designated classes of people do not gain access to firearms or weapons generally, but rather with prohibiting a class of weapons entirely. The traditional prohibition against carrying

dangerous and unusual weapons is not in dispute.  See Heller, 554 U.S. at 627, citing 4 Blackstone 148-149 (1769).

The question of the dangerousness of a weapon is well fixed in the common law through the distinction drawn between weapons that are dangerous per se and those that are dangerous as used. See Commonwealth v. Appleby, 380 Mass. 296, 303, cert. denied, 449 U.S. 1004 (1980) (setting out common-law definitions of dangerous weapons).  See also Commonwealth v. Wynton W., 459 Mass. 745, 748-755 (2011) (analyzing term "dangerous weapon" in context of G. L. c. 269, § 10 [j], barring possession of dangerous weapons on school grounds).  At common law, a weapon is dangerous per se if it is an "instrumentality designed and constructed to produce death or great bodily harm" and "for the purpose of bodily assault or defense."  Appleby, supra at 303. Weapons of this type include "firearms, daggers, stilettos and brass knuckles" but not "pocket knives, razors, hammers, wrenches and cutting tools."  Id.  The weapons not so classified all share the same characteristic:  they were designed primarily as tools and only secondarily utilized as weapons.  The Court in Heller confirms this method of analysis in discussing Miller, 307 U.S. at 178.  See Heller, 554 U.S. at 622 (Miller decision concerned with design or "type of weapon at issue" and not use [emphasis omitted]).

The statute at issue here explicitly prohibits "a portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure, or kill."  G. L. c. 140, § 131J.  From this statutory definition, we easily conclude that any weapon regulated by § 131J would be classified as dangerous per se at common law.  The parties have stipulated that the stun gun at issue here falls within the purview of § 131J and is a weapon.  Accordingly, we consider the stun gun a per se dangerous weapon at common law.  The record demonstrates no evidence or argument that its purpose is for anything other than "bodily assault or defense."  Appleby, 380 Mass. at 303.

We turn next to the question whether a weapon is unusual. Historically, when considering challenges to the ban of dangerous and unusual weapons under the Second Amendment or equivalent State statutes, courts have asked whether the weapon in question is unusual by ascertaining if it is a weapon of warfare to be used by the militia.  See Hill v. State, 53 Ga. 472, 474-477 (1874); Aymette v. State, 21 Tenn. 154, 158-160 (1840); English v. State, 35 Tex. 473, 476-477 (1871); State v. Workman, 335 W. Va. 367, 372-374 (1891).  The Supreme Court utilized this approach in Miller, 307 U.S. at 178, and approved its use in Heller.  The Court said,

"'In the colonial and revolutionary war era, [small-arms] weapons used by militia men and weapons used in defense of

person and home were one and the same.' State v. Kessler, 289 Ore. 359, 368 . . . (1980) (citing G. Neumann, Swords and Blades of the American Revolution 6-15, 252-254 [1973]). Indeed, that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface. We therefore read Miller to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."[5]

Heller, 554 U.S. at 624-625. Thus, the questions whether a weapon is "unusual" and whether the weapon was "in common use at the time" of enactment are interrelated. Id. at 627-628.

The ban on the private possession of stun guns will not burden conduct that falls within the scope of the Second Amendment if a stun gun is a weapon not "in common use at the time" of enactment of the Second Amendment and would be dangerous per se at common law without another, primary use, i.e., as a tool. See Heller, 554 U.S. at 624-625, 627, quoting Miller, 307 U.S. at 179. For reasons that follow, there can be no doubt that a stun gun was not in common use at the time of enactment, and it is not the type of weapon that is eligible for Second Amendment protection. See Heller, supra at 622.

The record is silent as to the development of the stun gun. The record indicates only that stun guns have been available commercially for private purchase since the early 1990s. We

---

[5] In State v. Kessler, 289 Ore. 359, 368 (1980), the Oregon Supreme Court described the type of weapons typically used by militiamen in defense of home and for purposes of the militia as being a musket or rifle, a hatchet, sword and knife or pike (a long shaft with a spear head).

note that that the first patent for stun gun was filed in 1972. See Weapon for Immobilization and Capture, U.S. Patent No. 3,803,463 (filed July 10, 1972). The recent invention of this weapon clearly postdates the period relevant to our analysis. We therefore conclude that stun guns were not in common use at the time of the Second Amendment's enactment. A stun gun also is an unusual weapon. In her motion to dismiss the complaint against her, the defendant acknowledged that the "number of Tasers and stun guns is dwarfed by the number of firearms." Moreover, although modern handguns were not in common use at the time of enactment of the Second Amendment, their basic function has not changed: many are readily adaptable to military use in the same way that their predecessors were used prior to the enactment. A stun gun, by contrast, is a thoroughly modern invention. Even were we to view stun guns through a contemporary lens for purposes of our analysis, there is nothing in the record to suggest that they are readily adaptable to use in the military. Indeed, the record indicates "they are ineffective for . . . hunting or target shooting." Because the stun gun that the defendant possessed is both dangerous per se at common law and unusual, but was not in common use at the time of the enactment of the Second Amendment, we conclude that stun guns fall outside the protection of the Second Amendment. See Heller, 554 U.S. at 622, 627.

The question remains whether the total ban on stun guns has a rational basis. Those who challenge the constitutionality of a statute that burdens neither a suspect group nor a fundamental constitutional right bear a heavy burden in overcoming the presumption of constitutionality in favor of the statute's validity. See English v. New England Med. Ctr., Inc., 405 Mass. 423, 427, cert. denied, 493 U.S. 1056 (1989). Such is the case before us. For due process claims, the test under "the Federal Constitution is 'whether the statute bears a reasonable relation to a permissible legislative objective' . . . and, under the . . . State Constitution [is] whether the statute 'bears real and substantial relation to public health, safety, morals, or some other phase of the general welfare'" (citations omitted). Id. at 430. For equal protection claims, the test is the same under both Constitutions, namely, whether the statute is "rationally related to the furtherance of a legitimate State interest" (citations omitted)". Id. at 428. Under the State Constitution the test also "includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class." Id. at 429, quoting Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 452 (1985) (Stevens, J., concurring). The defendant does not challenge the statute on the basis of any group

classification.  We therefore focus on the challenge under principles of due process.

The defendant does not articulate any basis for challenging the statute under the rational basis test.  Nevertheless, we note that stun guns deliver a charge of up to 50,000 volts.  They are designed to incapacitate a target by causing disabling pain, uncontrolled muscular contractions, and general disruption of the central nervous system.  See Amnesty International, Less than Lethal?  Use of Stun Weapons in U.S. Law Enforcement, 1-2, 6-7 & nn.17, 18 (2008), available at https://www.amnesty.org/download/Documents/52000/amr510102008en. pdf [https://perma.cc/JK53-XMR3] (last visited February 26, 2015).  It is difficult to detect clear signs of use and misuse of stun guns, unlike handguns.  Stun guns can deliver repeated or prolonged shocks without leaving marks.  Id. at 1-2.  The Legislature rationally could ban their use in the interest of public health, safety, or welfare.  Removing from public access devices that can incapacitate, injure, or kill a person by disrupting the central nervous system with minimal detection is a classic legislative basis supporting rationality.  It is immaterial that the Legislature has not banned weapons that are more lethal.  Mathematical precision by the Legislature is not constitutionally required.  See Commonwealth v. McQuoid, 369 Mass. 925, 927-928 (1976).  The statute easily passes the

rational basis test under both the Federal and State Constitutions.

    Self-defense when homeless.  Although we already have concluded that the defendant's possession of a stun gun was in violation of a statute regulating a weapon not protected by the Second Amendment, we touch briefly on her claim that her homelessness at the time of her arrest should not deprive her of her right to defend herself.  As noted above, the Supreme Court's holding in Heller stressed the particular importance of the right to defend hearth and home as the core of the Second Amendment.  See Hightower, 693 F.3d at 72 & n.8 (noting emphasis in Heller on "hearth and home" and subsequent interpretations).  A homeless person may indeed have a home for constitutional purposes, and this question must be determined on a case-by-case basis.  For example, constitutional protections against unreasonable search and seizure can be extended to a variety of living situations.  See Commonwealth v. Porter P., 456 Mass. 254, 260-261 (2010) (holding reasonable expectation of privacy exists in transitional living space); Commonwealth v. Paszko, 391 Mass. 164, 184-185 (1984) (hotel room during rental period).  However, where a stun gun itself is not a type of weapon the possession of which is protected under the Second Amendment, we need not decide whether a hotel room may be treated as a home under the Second Amendment.  Moreover, the stun gun was found

not in the defendant's hotel room but on her person in a motor vehicle, outside the "core" of the Second Amendment.

Finally, neither the legislative ban on stun guns nor our decision affects the defendant's right to bear arms under the Second Amendment. Barring any cause for disqualification the defendant could have applied for a license to carry a firearm. See G. L. c. 140, §§ 129B, 131 (c). In addition, again barring any disqualification, possession of mace or pepper spray for self-defense no longer requires a license. See G. L. c. 140, § 122D, inserted by St. 2014, c. 284, § 22. We hold only that the defendant's weapon of choice, the stun gun, is not protected by the Second Amendment. We acknowledge that stun guns may have value for purposes of self-defense, but because they are not protected by the Second Amendment and because a rational basis exists for their prohibition, the lawfulness of their possession and use is a matter for the Legislature.

Conclusion. For the reasons stated above, we hold that G. L. c. 140, § 131J, does not violate the Second Amendment right articulated in Heller. We affirm the defendant's conviction of possession of an electrical weapon in violation of G. L. c. 140, § 131J.

So ordered.