# United States Court of Appeals
## For the First Circuit

No. 18-1545

DAVID SETH WORMAN; ANTHONY LINDEN; JASON WILLIAM SAWYER; PAUL NELSON CHAMBERLAIN; GUN OWNERS' ACTION LEAGUE, INC.; ON TARGET TRAINING, INC.; OVERWATCH OUTPOST,

Plaintiffs, Appellants,

v.

MAURA T. HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts; DANIEL BENNETT, in his official capacity as the Secretary of the Executive Office of Public Safety and Security; KERRY GILPIN, in her official capacity as Superintendent of the Massachusetts State Police,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Barron, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

John Parker Sweeney, with whom James Michael Campbell, Richard Paul Campbell, Campbell Campbell Edwards & Conroy PC, T. Sky Woodward, James W. Porter, III, Marc A. Nardone, and Bradley Arant Boult Cummings LLP, were on brief, for appellants.

---

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Ilya Shapiro, Trevor Burrus, Matthew Larosiere, Joseph G.S. Greenlee, and David B. Kopel on brief for Professors of Second Amendment Law, Cato Institute, Second Amendment Foundation, Citizens Committee for the Right to Keep and Bear Arms, Jews for the Preservation of Firearms Ownership, Millennial Policy Center, and Independence Institute, amici curiae.

Dan M. Peterson, Dan M. Peterson PLLC, C. D. Michel, Sean A. Brady, Anna M. Barvir, and Michel & Associates, P.C., on brief for Western States Sheriffs' Association, Law Enforcement Legal Defense Fund, Law Enforcement Action Network, International Association of Law Enforcement Firearms Instructors, CRPA Foundation, International Law Enforcement Educators and Trainers Association, and Law Enforcement Alliance of America, amici curiae.

David H. Thompson, Peter A. Patterson, John D. Ohlendorf, and Cooper & Kirk, PLLC, on brief for National Rifle Association of America, Inc., amicus curiae.

Julia E. Kobick, Assistant Attorney General, with whom Maura Healey, Attorney General, William W. Porter and Elizabeth Kaplan, Assistant Attorneys General, and Gary Klein, Special Assistant Attorney General, were on brief, for appellees.

Jonathan K. Baum, Mark T. Ciani, Katten Muchin Rosenman LLP, J. Adams Skaggs, and Hannah Shearer on brief for Giffords Law Center to Prevent Gun Violence, amicus curiae.

Mariel Goetz, Kimberly A. Mottley, Laura Stafford, and Proskauer Rose LLP, on brief for Brady Center to Prevent Gun Violence, amicus curiae.

Edward Notis-McConarty, M. Patrick Moore, Jr., Vanessa A. Arslanian, and Hemenway & Barnes LLP on brief for Massachusetts Chiefs of Police Association and Massachusetts Major City Chiefs of Police Association, amici curiae.

Gurbir S. Grewal, Attorney General of New Jersey, Andrew J. Bruck, Executive Assistant Attorney General, Jeremy M. Feigenbaum and Glenn Moramarco, Assistant Attorneys General, Melissa Medoway, Deputy Attorney General, Xavier Becerra, Attorney General of California, George Jepsen, Attorney General of Connecticut, Matthew P. Denn, Attorney General of Delaware, Russell A. Suzuki, Attorney General of Hawai'i, Tom Miller, Attorney General of Iowa, Brian E. Frosh, Attorney General of Maryland, Ellen F. Rosenblum, Attorney General of Oregon, Josh Shapiro, Attorney General of Pennsylvania, Peter F. Kilmartin, Attorney General of Rhode Island, Mark R. Herring, Attorney General of Virginia, Thomas J. Donovan, Jr., Attorney General of Vermont, Robert W. Ferguson, Attorney General of Washington, Karl A. Racine, Attorney General for the District of Columbia, on brief for states of New Jersey, California, Connecticut, Delaware, Hawai'i, Iowa, Maryland, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington,

and the District of Columbia, amici curiae.

Eric Tirschwell, William J. Taylor, Jr., Mark Anthony Frassetto, Deepak Gupta, Jonathan E. Taylor, and Gupta Wessler PLLC, on brief for Everytown for Gun Safety, amicus curiae.

Albert W. Wallis, Elizabeth A. Ritvo, Tristan G. Axelrod, Brown Rudnick LLP, Kenneth A. Sweder, and Sweder & Ross LLP, on brief for Jewish Alliance for Law and Social Action, Greater Boston Interfaith Organization, Episcopal Diocese of Massachusetts, Episcopal Diocese of Western Massachusetts, Islamic Society of Boston, Massachusetts Council of Churches, Union for Reform Judaism, Central Conference of American Rabbis, Women of Reform Judaism, and Men of Reform Judaism, amici curiae.

Ben T. Clements and Clements & Pineault, LLP, on brief for Stop Handgun Violence, MA Coalition to Prevent Gun Violence, and Massachusetts General Hospital Gun Violence Prevention Coalition, amici curiae.

James Murray, pro se, on brief for James Murray, amicus curiae.

———————————

April 26, 2019

———————————

**SELYA**, **Circuit Judge**.  This high-profile case involves a constitutional challenge to a Massachusetts law proscribing the sale, transfer, and possession of certain semiautomatic assault weapons and large-capacity magazines (LCMs).  See Mass. Gen. Laws ch. 140, §§ 121, 131M (the Act).  The plaintiffs assert that they have an unfettered Second Amendment right to possess the proscribed assault weapons and LCMs in their homes for self-defense.[1]  The district court granted summary judgment in favor of the defendants (a phalanx of state officials).  See Worman v. Healey, 293 F. Supp. 3d 251, 271 (D. Mass. 2018).  Although our reasoning differs in certain respects from that of the court below, we affirm.

We assume, without deciding, that the proscribed weapons have some degree of protection under the Second Amendment.  We further assume, again without deciding, that the Act implicates the core Second Amendment right of self-defense in the home by law-abiding, responsible individuals.  We hold, however, that the Act's burden on that core right is minimal and, thus, the Act need only withstand intermediate scrutiny — which it does.

## I. BACKGROUND

We start by rehearsing the background and travel of the case.  The Massachusetts legislature modeled the Act on the 1994

---

[1]  Throughout this opinion, we use the terms "proscribed assault weapons and LCMs" and "proscribed weapons" interchangeably to describe the semiautomatic assault weapons and LCMs targeted by the Act.

federal Public Safety and Recreational Firearms Use Protection Act (the federal regulation), Pub. L. No. 103-322, §§ 110101-06, 108 Stat. 1796, 1996-2010 (1994), which is no longer in effect.  The federal regulation prohibited the manufacture, transfer, and possession of "semiautomatic assault weapons" and the transfer and possession of "large capacity ammunition feeding devices."  Id. §§ 110102-03, 108 Stat. at 1996-2000.  For purposes of the federal regulation, the term "semiautomatic assault weapon" was defined to include nineteen specific models, as well as any semiautomatic rifle, pistol, or shotgun with two or more combat-style features or the ability to accept a detachable magazine.  Id. § 110102(b), 108 Stat. at 1997-98.  The term "large capacity ammunition feeding device" encompassed any magazine or other feeding device that could accept more than ten rounds of ammunition.  Id. § 110103(b), 108 Stat. at 1999.  The federal regulation specifically exempted, inter alia, assault weapons that were lawfully possessed on the date of its enactment (September 13, 1994), semiautomatic rifles that could not hold more than five rounds of ammunition or accept a detachable magazine holding more than five rounds of ammunition, and a specific list of "long guns most commonly used in hunting and recreational sports."  H.R. Rep. No. 103-489, at 20 (1994); see Pub. L. No. 103-322, § 110102(a), 108 Stat. at 1996-97.  In explicating the purpose of the federal regulation, Congress stated that semiautomatic assault weapons have "a capability for

lethality — more wounds, more serious, in more victims — far beyond that of other firearms in general, including other semiautomatic guns." H.R. Rep. No. 103-489, at 19-20.

Four years after Congress enacted the federal regulation, the Massachusetts legislature passed a counterpart statute, which made it a crime to sell, transfer, or possess semiautomatic assault weapons as defined by the federal regulation, copies or duplicates of those weapons, and LCMs capable of holding more than ten rounds of ammunition. See Mass. Gen. Laws ch. 140, §§ 121, 131M. The Act contained the same exceptions as the federal regulation, including free passes for weapons lawfully owned on September 13, 1994, and for sundry automatic rifles commonly used for hunting and sport. See id.

Congress allowed the federal regulation to expire in 2004, but the Massachusetts legislature struck out in a different direction and made the Massachusetts assault weapons regulation permanent that year. In signing the bill into law, then-Governor Romney declared that semiautomatic assault weapons and LCMs "are not made for recreation or self-defense. They are instruments of destruction with the sole purpose of hunting down and killing people."

We fast-forward to 2016 when the Massachusetts Attorney General, Maura Healey, issued a public enforcement notice designed to "provide[] guidance on the identification of weapons that are

'copies' or 'duplicates' of the enumerated Assault weapons that are banned under Massachusetts law."  Approximately six months later, the plaintiffs — a diverse group consisting of Massachusetts firearm owners, prospective firearm owners, firearm dealers, and a firearm advocacy association — brought suit in the federal district court, alleging constitutional violations and seeking declaratory and injunctive relief.  They named an array of defendants including (as relevant here) various state officials in their representative capacities; claimed that the Act, as interpreted and enforced by those officials, abridged both the Second Amendment and the Due Process Clause; and prayed for declaratory and injunctive relief.

After some procedural skirmishing, not relevant here, the parties cross-moved for summary judgment.  The district court heard arguments of counsel and reserved decision.  The court subsequently handed down a rescript in which it rejected the plaintiffs' challenges and explained why it was granting the defendants' summary judgment motion.  See Worman, 293 F. Supp. 3d at 258-71.  This timely appeal ensued.  In it, the plaintiffs challenge only the district court's rejection of their Second Amendment claims.

## II. ANALYSIS

We review the grant of a motion for summary judgment de novo, taking the facts and all reasonable inferences therefrom to

- 7 -

the behoof of the non-moving parties (here, the plaintiffs). See Hightower v. City of Boston, 693 F.3d 61, 70 (1st Cir. 2012); Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). "We will affirm only if the record reveals 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Avery v. Hughes, 661 F.3d 690, 693 (1st Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). This standard applies unabated to appeals — like this one — arising out of a district court's disposition of cross-motions for summary judgment. See Blackie v. Maine, 75 F.3d 716, 720-21 (1st Cir. 1996). In applying the standard here, we have the benefit not only of able briefing by the parties but also of a myriad of thoughtful amicus briefs (for which we are grateful).

## A. The Legal Framework.

The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In a seminal decision, the Supreme Court held that the Second Amendment protects an individual's right to keep and bear arms (unconnected to service in the militia). See District of Columbia v. Heller, 554 U.S. 570, 592 (2008). Two years later, the Court made pellucid that the Second Amendment applies to the states through the Fourteenth Amendment. See McDonald v. City of Chicago, 561 U.S. 742, 750 (2010).

- 8 -

The law challenged in Heller constituted an "absolute prohibition of handguns held and used for self-defense in the home," which (the Court ruled) transgressed the Second Amendment.[2] 554 U.S. at 635-36. Although the Court did not have occasion to examine "the full scope of the Second Amendment" right, it cautioned that the right "is not unlimited." Id. at 626. In furtherance of this cautionary language, the Court admonished that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27. The Court added that the Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626.

We glean from the teachings of Heller that four data points determine the level of protection, if any, that the Second

_____

[2] Although the present plaintiffs attempt to characterize the Act as an "absolute prohibition" on an entire class of firearms, that characterization is inapt. The Act applies only to a set of enumerated semiautomatic assault weapons, to semiautomatic assault weapons with particular features, and to magazines of a specific capacity. Seen in this light, the plaintiffs' "absolute prohibition" argument is circular: essentially, it amounts to a suggestion that whatever group of weapons a regulation prohibits may be deemed a "class." By this logic — which we squarely reject — virtually any regulation could be considered an "absolute prohibition" of a class of weapons.

Amendment provides.  The first data point involves the person who is asserting the right; the second data point involves the purpose for which the right is being asserted; the third data point involves the place where the right is being asserted; and the fourth data point involves the type of weapon.  Heller's most meaningful message touches all four data points.  Refined to bare essence, its message is that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  Id. at 635.

As applied here, this message checks off the first three data points.  It is undisputed that the individual plaintiffs are not prohibited persons but, rather, law-abiding, responsible citizens.  Similarly, it is undisputed that they seek to use the proscribed assault weapons and LCMs for self-defense.  And, finally, it is undisputed that they seek to effectuate this usage in their homes.  We are, therefore, left to focus on the fourth data point:  the arms proscribed and the extent (if at all) that those arms are protected by the Second Amendment.

In conducting this inquiry, we do not write on an entirely pristine page.  Our recent decision in Gould v. Morgan mapped out a two-step approach for analyzing Second Amendment challenges.  See 907 F.3d 659, 668-69 (1st Cir. 2018), petition for cert. filed, ___ U.S.L.W. ___ (U.S. April 1, 2019) (No. 18-1272).  Under this approach, we first ask whether the challenged

law burdens conduct that is protected by the Second Amendment. See id. This inquiry is "backward-looking" and "seeks to determine whether the regulated conduct 'was understood to be within the scope of the right at the time of ratification.'" Id. at 669 (quoting United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010)). If that step is successfully negotiated so we can say that the challenged law "burdens conduct falling within the scope of the Second Amendment, [we] then must determine what level of scrutiny is appropriate and must proceed to decide whether the challenged law survives that level of scrutiny." Id. We follow this approach in determining whether the Act withstands the plaintiffs' Second Amendment onslaught.

## B. **The Scope of the Second Amendment Right.**

This brings us to the question of whether the conduct restricted by the Act falls under the protective carapace of the Second Amendment. To answer this question, we must determine whether possession of the proscribed assault weapons and LCMs in the home for self-defense is safeguarded by the Second Amendment.[3]

---

[3] One of the amici advances the clever argument that LCMs, like other magazines, are not "arms" at all because they are not themselves "[w]eapons of offense, or armour of defence." Heller, 554 U.S. at 581 (alteration in original) (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)). The defendants, though, have not proffered such an argument. We ordinarily refuse to entertain arguments advanced by amici but not by the parties, see, e.g., In re Sony BMG Music Entm't, 564 F.3d 1, 3 (1st Cir. 2009); Lane v. First Nat'l Bank of Bos., 871 F.2d 166, 175 (1st Cir. 1989), and we see no reason to depart from that

- 11 -

Our first task is to consider whether the proscribed weapons are the type of arms "understood to be within the scope of the [Second Amendment] right at the time of ratification."  Id. (quoting Chester, 628 F.3d at 680).  Heller is the beacon by which we must steer.  There, the Court explained that "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense."  554 U.S. at 624 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)).[4] The Court's earlier decision in Miller (which held that a short-barreled shotgun was not protected by the Second Amendment) furnishes further context.  See 307 U.S. at 175-83.  There, the Court surveyed state laws regulating militias at the time of the founding and explained that many states, including Massachusetts, had specified the types of weapons that citizens were required to bring to militia service.  See id. at 180-82.  The Court concluded

_____

prudential principle here.  We note, moreover, that the parties do not argue that the Second Amendment analysis differs with respect to LCMs as opposed to semiautomatic assault weapons, and so we consider both objects of the Act together.

    [4] Here, however, there is a wrinkle.  Because the plaintiffs' challenge is directed at a state statute, Gould points to 1868 (when the Fourteenth Amendment was ratified) as the date for any necessary historical inquiry.  See 907 F.3d at 669.  Heller, in contrast, does not deal with a state law and thus locates the benchmark at 1791 (the date of ratification of the Constitution itself).  Since no party here has argued that this distinction is either material or sufficient to render Heller's analysis inoperative, we need not parse this distinction as "our conclusion with respect to the historical record would be the same regardless of which ratification date was used."  Id. at 669 n.3.

- 12 -

that although "[m]ost if not all of the States have adopted provisions touching the right to keep and bear arms," id. at 182, none has suggested that a short-barreled shotgun was the type of weapon that "could contribute to the common defense," id. at 178. With this historical background in place, the Heller Court determined that the Second Amendment "extends only to certain types of weapons." 554 U.S. at 623. One corollary of this determination is that an "important limitation on the right to keep and carry arms" is that "the sorts of weapons protected were those 'in common use at the time.'" Id. at 627 (quoting Miller, 307 U.S. at 179). The Court added that such a "limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" Id. (citing 4 William Blackstone, Commentaries on the Laws of England 148-49 (1769)); see id. at 623 (referencing "the prohibition on terrorizing people with dangerous or unusual weapons").

That the proscribed weapons were not in existence, let alone in common use, at the time of ratification, does not end the matter. Heller left no doubt that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Id. at 582. The Court reaffirmed this principle some eight years later, when it reversed a decision of the Massachusetts Supreme Judicial Court (SJC), which had held that stun guns were not

- 13 -

protected by the Second Amendment.  See Caetano v. Massachusetts, 136 S. Ct.  1027, 1027-28 (2016) (per curiam).  Pertinently, the Caetano Court debunked the notion that stun guns were unprotected because they "were not in common use at the time of the Second Amendment's enactment," id. at 1027 (quoting Commonwealth v. Caetano, 26 N.E.3d 688, 693 (Mass. 2015)), finding that notion "inconsistent with Heller's clear statement that the Second Amendment 'extends . . . to . . . arms that were not in existence at the time of the founding,'" id. at 1028 (alteration in original) (quoting Heller, 554 U.S. at 582); see id. (rejecting conclusion "that stun guns are 'unusual' because they are 'a thoroughly modern invention'" (quoting Caetano, 26 N.E.3d at 693-94)).

Relatedly, the Heller Court acknowledged that "if weapons that are most useful in military service — M-16 rifles and the like — may be banned," it might be argued that "the Second Amendment right is completely detached from the prefatory clause." 554 U.S. at 627.  After all, militias today "require sophisticated arms that are highly unusual in society at large." Id.  But the Court pointed out that "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." Id.  Thus, "the fact that modern developments have limited the degree of fit

between the prefatory clause and the protected right cannot change [judicial] interpretation of the right."  Id. at 627-28.

Viewed against this backdrop, the relevant question is neither whether the proscribed weapons were commonly used at the time of ratification nor whether they are among the types of weapons used by today's militias.  Instead, the question is whether the proscribed weapons are in common use for lawful purposes like self-defense.

As to this question, Heller provides only meager guidance.  Heller made plain that handguns, which the Court described as "the most popular weapon chosen by Americans for self-defense in the home," are protected.  Id. at 629.  Conversely, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." Id. at 625.  But as to the middle ground — and particularly, as to how to plot the dividing line between common and uncommon use — the Court was silent.[5]

_____

[5] We agree with the Seventh Circuit that measuring "common use" by the sheer number of weapons lawfully owned is somewhat illogical.  See Friedman v. City of Highland Park, 784 F.3d 406, 409 (7th Cir. 2015) ("Machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal.  Yet it would  be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned.").

- 15 -

The parties strive mightily to fill this void. On the one hand, the plaintiffs have shown that, as of 2013, nearly 5,000,000 people owned at least one semiautomatic assault weapon. They also have shown that between 1990 and 2015, Americans owned approximately 115,000,000 LCMs. On the other hand, the defendants have shown that only three percent of guns in the United States are assault weapons and only one percent of Americans own such a weapon. In all events, the record evidence is sparse as to actual use of any of the proscribed weapons or LCMs for self-defense in the home.

The district court avoided this question entirely. It abjured the "in common use" test, concluding that "Heller . . . presents us with a dispositive and relatively easy inquiry: Are the banned assault weapons and large-capacity magazines 'like' 'M-16 rifles,' i.e., 'weapons that are most useful in military service,' and thus outside the ambit of the Second Amendment?" Worman, 293 F. Supp. 3d at 264 (quoting Kolbe v. Hogan, 849 F.3d 114, 136 (4th Cir.) (en banc), cert. denied, 138 S. Ct. 469 (2017)). The court went on to find that the proscribed weapons fit within this taxonomy, noting by way of example that one of the proscribed weapons (the Colt AR-15) is virtually identical to the M-16 (save for the fact that the AR-15 does not allow for fully automatic fire). See id. at 264-66. The plaintiffs argue that this approach is doubly flawed: they calumnize both the district

- 16 -

court's conclusion that "weapons that are most useful in military service" are excepted from Second Amendment coverage and its determination that the proscribed weapons are "like" "M-16 rifles."

Mindful that "[d]iscretion is often the better part of valor," United States v. Gonzalez, 736 F.3d 40, 40 (1st Cir. 2013), we are reluctant to plunge into this factbound morass. In the end, "courts should not rush to decide unsettled issues when the exigencies of a particular case do not require such definitive measures." Privitera v. Curran (In re Curran), 855 F.3d 19, 22 (1st Cir. 2017). For present purposes, we simply assume, albeit without deciding, that the Act burdens conduct that falls somewhere within the compass of the Second Amendment.

## C. **The Level of Scrutiny.**

The next phase of our inquiry "requires us to evaluate the [Act] under an appropriate level of scrutiny." Gould, 907 F.3d at 670. The appropriate level of scrutiny "turn[s] on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right." Id. at 670-71. We previously established "that the core Second Amendment right is limited to self-defense in the home" on the part of "responsible, law-abiding individuals." Id. at 671. Given this understanding, we concluded that the law challenged in Gould (which concerned public carriage of firearms) fell outside the

- 17 -

core of the Second Amendment right.  See id. at 672.  In contrast to the plaintiffs in Gould, the present plaintiffs contend that the Act affects their ability to defend themselves in their homes. Assuming (favorably to the plaintiffs) that the Act implicates the core of the Second Amendment right, we must train the lens of our inquiry on "how heavily it burdens that right."  Id. at 671.

As is true in many Second Amendment inquiries, our starting point is Heller.  There, the Court unequivocally rebuffed the argument "that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."  544 U.S. at 629.  The Court's rationale was based on the premise that "the American people have considered the handgun to be the quintessential self-defense weapon."  Id.  In fashioning this rationale, the Court repeatedly emphasized the unique popularity of the handgun as a means of self-defense.  See id. at 628 (calling handguns a "class of 'arms' . . . overwhelmingly chosen by American society for [self-defense]"); id. at 628-29 (identifying the handgun as "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family"); id. at 629 (declaring that "handguns are the most popular weapon chosen by Americans for self-defense in the home").  Building on this foundation, the Court made clear that banning this quintessential self-defense weapon would heavily burden the core right of self-defense in the home.  See id. at

- 18 -

629; see also id. at 632 (describing eighteenth-century gunpowder storage laws and noting that such laws did "not remotely burden the right of self-defense as much as an absolute ban on handguns").

This same logic leads us to conclude that the Act's restriction on semiautomatic assault weapons and LCMs does not heavily burden the core right of self-defense in the home. As an initial matter, the Act does not ban all semiautomatic weapons and magazines. Instead, it proscribes only a set of specifically enumerated semiautomatic assault weapons, magazines of a particular capacity, and semiautomatic assault weapons that have certain combat-style features. Furthermore, the record shows that semiautomatic assault weapons do not share the features that make handguns well-suited to self-defense in the home. Cf. id. at 629 (explaining that "a citizen may prefer a handgun for home defense" because, inter alia, "[i]t is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police"). Equally as important is what the record does not show: it offers no indication that the proscribed weapons have commonly been used for home self-defense purposes. In fact, when asked directly, not one of the plaintiffs or their six experts could identify even a single example of the use of an assault

weapon for home self-defense, nor could they identify even a single example of a self-defense episode in which ten or more shots were fired. Viewed as a whole, the record suggests that wielding the proscribed weapons for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut. Thus, we conclude that the Act does not heavily burden the core Second Amendment right of self-defense within the home.

This conclusion fits seamlessly with our decision in Hightower. Although that opinion did not directly address what restrictions may be deemed to heavily burden the core Second Amendment right, we stated that the fact that the plaintiff sought a license that "allowed carrying of large capacity weapons weaken[ed] the Second Amendment claim, as [Heller] was concerned with weapons of the type characteristically used to protect the home." Hightower, 693 F.3d at 71 (holding that revocation of license to carry concealed, large-capacity firearm based on false statements in renewal application did not violate Second Amendment). So, too, our conclusion is reinforced by the fact that — unlike the use of handguns — the use of semiautomatic assault weapons, even in the home, does not "implicate[] the safety only of those who live or visit there." Gould, 907 F.3d at 672. Rather, the use of semiautomatic assault weapons implicates the safety of the public at large. After all, such weapons can fire through walls, risking the lives of those in nearby apartments or

on the street.  Cf. Kolbe, 849 F.3d at 127 (observing that "rounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials").

We have yet to consider what level of scrutiny applies to a law that implicates the core of the Second Amendment right, but does not "heavily . . . burden[] that right." Gould, 907 F.3d at 671.  Heller does state that a handgun ban would "fail constitutional muster" under "any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights." 554 U.S. at 628-29.  But we do not read Heller to suggest that a regulation of arms that only modestly burdens the core Second Amendment right must be subject to the strictest form of constitutional review.  See Gould, 900 F.3d at 673 ("The Heller Court . . . implie[d] that there is a role for some level of scrutiny less rigorous than strict scrutiny."); see also Ezell v. City of Chicago, 651 F.3d 684, 708 (7th Cir. 2011) ("[A] severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. . . . [L]aws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified.").

In our view, intermediate scrutiny is appropriate as long as a challenged regulation either fails to implicate the core

Second Amendment right or fails to impose a substantial burden on that right. See Fyock v. Sunnyvale, 779 F.3d 991, 998-99 (9th Cir. 2015). It follows that intermediate scrutiny is the appropriate level of scrutiny for evaluating a law — like the Act — that arguably implicates the core Second Amendment right to self-defense in the home but places only a modest burden on that right. This holding aligns us with a number of our sister circuits, which have applied intermediate scrutiny to laws restricting semiautomatic assault weapons and LCMs. See, e.g., Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J., 910 F.3d 106, 117 (3d Cir. 2018) (applying intermediate scrutiny because "[t]he Act here does not severely burden the core Second Amendment right to self-defense in the home"); Kolbe, 849 F.3d at 134 (applying intermediate scrutiny because challenged law did "not seriously impact a person's ability to defend himself in the home" (internal quotation marks omitted)); N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 260 (2d Cir. 2015) (applying intermediate scrutiny because "[t]he burden imposed by the challenged legislation is real, but . . . not 'severe'"); Heller v. District of Columbia (Heller II), 670 F.3d 1244, 1262 (D.C. Cir. 2011) (applying intermediate scrutiny because challenged prohibition did not "substantially affect" individuals' right of self-defense).[6]

---

[6] After we heard oral argument in this case, the Illinois Supreme Court held that a law prohibiting the carrying of tasers

Consequently, we proceed to apply intermediate scrutiny to determine whether the Act passes constitutional muster.

### D. **Applying Intermediate Scrutiny.**

To survive intermediate scrutiny, a statute "must be substantially related to an important governmental objective." Gould, 907 F.3d at 672 (quoting Clark v. Jeter, 486 U.S. 456, 461 (1988)). To achieve this substantial relationship, there must be a "reasonable fit" between the restrictions imposed by the law and the government's valid objectives, "such that the law does not burden more conduct than is reasonably necessary." Id. at 674 (quoting Drake v. Filko, 724 F.3d 426, 436 (3d Cir. 2013)).

The law that the plaintiffs challenge here — the Act — restricts the sale, transfer, and possession of certain semiautomatic assault weapons and LCMs. See Mass. Gen. Laws ch. 140, §§ 121, 131M. It does not ban the sale, transfer, or possession of all semiautomatic weapons, nor does it impose any restrictions on magazines that are designed to hold ten rounds or

---

and stun guns was a "categorical ban" and, thus, was "facially unconstitutional under the [S]econd [A]mendment." Illinois v. Webb, ___ N.E. 3d ___, ___ (Ill. 2019) [2019 WL 1291586 at *5]. The plaintiffs notified us of this decision pursuant to Federal Rule of Appellate Procedure 28(j), asserting that it "provides further support for [their] argument that a categorical ban on bearable arms that are commonly kept for lawful purposes is per se unconstitutional." We reject the plaintiffs' premise that the Act is a categorical ban, see supra note 2, and disagree with the Illinois Supreme Court's conclusion that any law that restricts a certain type of arms is per se unconstitutional.

fewer.  The Act's manifest purpose is to "help keep the streets and neighborhoods of Massachusetts safe" by "mak[ing] it harder for criminals to get their hands on these dangerous guns."

We have said before, and today reaffirm, that "few interests are more central to a state government than protecting the safety and well-being of its citizens."  Gould, 907 F.3d at 673.  Since Massachusetts indubitably "has compelling governmental interests in both public safety and crime prevention," id., the only question that remains is whether the Act is substantially related to those interests.  The answer to this question depends on whether the fit between those interests and the Act is reasonable.  See id. at 674.

In our view, the Act survives under intermediate scrutiny.  This view comports with the unanimous weight of circuit-court authority analyzing Second Amendment challenges to similar laws.  See, e.g., Ass'n of N.J. Rifle & Pistol Clubs, 910 F.3d at 122; Kolbe, 849 F.3d at 139; N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 261; Heller II, 670 F.3d at 1262.

The record contains ample evidence of the unique dangers posed by the proscribed weapons.  Semiautomatic assault weapons permit a shooter to fire multiple rounds very quickly, allowing him to hit more victims in a shorter period of time.  LCMs exacerbate this danger, allowing the shooter to fire more bullets without stopping to reload.  Cf. Heller II, 670 F.3d at 1264

- 24 -

(noting that "the 2 or 3 second pause during which a criminal reloads his firearm can be of critical benefit to law enforcement" (internal quotation marks omitted)).  It is, therefore, not surprising that AR-15s equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history, including horrific events in Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012).

The record also contains the affidavit of a seasoned trauma surgeon, who has treated victims of several mass shootings. This affidavit confirms what common sense suggests:  semiautomatic assault weapons cause wounds that "tend to be higher in complexity with higher complication rates than those injuries from non-assault weapons.  They tend to cause far greater damage to the muscles, bones, soft tissue, and vital organs." Cf. Panagiotis K. Stefanopoulos, et al., Gunshot Wounds:  A Review of Ballistics Related to Penetrating Trauma, 3 J. Acute Disease 178, 181-82 (2014).  A number of articles, written by physicians who have cared for assault-weapon victims, substantiate the extreme damage that such weapons are prone to cause.  See, e.g., Gina Kolata & C.J. Chivers, Wounds from Military-Style Rifles?  'A Ghastly Thing to See', N.Y. Times (Mar. 4, 2018), https://www.nytimes.com/2018/03/04/health/parkland-shooting-victims-ar15.html ("The tissue destruction is almost unimaginable.

- 25 -

Bones are exploded, soft tissue is absolutely destroyed. The injuries to the chest or abdomen — it's like a bomb went off."); Tim Craig et al., <u>As the Wounded Kept Coming, Hospitals Dealt with Injuries Rarely Seen in U.S.</u>, Wash. Post (Oct. 3, 2017), <u>https://www.washingtonpost.com/national/health-science/as-the-wounded-kept-coming-hospitals-dealt-with-injuries-rarely-seen-in-the-us/2017/10/03/06210b86-a883-11e7-b3aa-c0e2e1d41e38_story.html?utm_term=.5a659eec267b</u> ("If a 9mm bullet strikes someone in the liver . . . that person might suffer a wound perhaps an inch wide, . . . [b]ut if you're struck in the liver with an AR-15, it would be like dropping a watermelon onto the cement. It just is disintegrated." (internal quotation marks omitted)).

The defendants proffered evidence that the majority of individuals who have perpetrated mass shootings obtain their semi-automatic assault weapons legally. <u>See, e.g.</u>, Larry Buchanan et al., <u>How They Got Their Guns</u>, N.Y. Times (updated Feb. 16, 2018), <u>https://www.nytimes.com/interactive/2015/10/03/us/how-mass-shooters-got-their-guns.html</u>; Mayors Against Illegal Guns, <u>Analysis of Recent Mass Shootings</u> (2013). This evidence lends support to the legislature's conclusion that a law proscribing semiautomatic assault weapons and LCMs — like the Act — will help curtail outbreaks of mass violence.

The plaintiffs do not dispute the extensive evidence regarding the lethality of the proscribed weapons and the frequency of their use in mass shootings. Instead, they argue that "[e]ven assuming the [Act] may curb criminal misuse of the Banned Firearms and Magazines," the Act fails intermediate scrutiny because it "make[s] no exception for law-abiding, responsible citizens to keep these arms for lawful purposes like self-defense in the home." According to the plaintiffs, the forbidden assault weapons and LCMs are "ideal" for domestic self-defense for many of the same reasons that such weapons are ideal for mass shootings — they are easier to hold and shoot, require less user accuracy, and allow a shooter to fire many times without reloading. Thus, the plaintiffs assert, any regulation prohibiting law-abiding, responsible citizens from possessing such weapons sweeps too broadly.

This assertion is too facile by half, and we reject it. Although we acknowledge that "[i]n dealing with a complex societal problem like gun violence, there will almost always be room for reasonable minds to differ about the optimal solution," Gould, 907 F.3d at 676, the plaintiffs give unduly short shrift to "the legislature's prerogative . . . to weigh the evidence, choose among conflicting inferences, and make the necessary policy judgments," id. The role of a reviewing court is limited to ensuring "that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence," id.

(alteration in original) (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 666 (1994) (opinion of Kennedy, J.)), and that "the fit between the asserted governmental interests and the means chosen to advance them is close enough to pass intermediate scrutiny," id. at 674.

Here, the Massachusetts legislature's conclusion that the Commonwealth's legitimate interests are best served by proscribing semiautomatic assault weapons and LCMs rests on substantial (although not incontrovertible) evidence regarding the inordinate dangers associated with the proscribed weapons. What is more, it strains credulity to argue that the fit between the Act and the asserted governmental interest is unreasonable. As we have said, the Act does not outlaw all semiautomatic firearms and magazines. Nor does it circumscribe in any way the fundamental right of law-abiding, responsible citizens to possess handguns in their homes for self-defense. Accordingly, we hold that although the Act may well "touch[] the right to keep and bear arms," Miller, 307 U.S. at 182, it does not impermissibly intrude upon that right because it withstands intermediate scrutiny.

**III. CONCLUSION**

This case concerns an issue of paramount importance. In the wake of increasingly frequent acts of mass violence committed with semiautomatic assault weapons and LCMs, the interests of state and local governments in regulating the possession and use of such

weapons are entitled to great weight. Even so, we recognize that such interests must be balanced against the time-honored right of individuals to bear arms in self-defense — a right that is protected in varying degrees by the Second Amendment.

Holding this delicate balance steady and true is difficult but necessary work. Here, we find that even if the Act implicates the core of the Second Amendment right, it (at most) minimally burdens that right. Consequently, we are obliged to cede some degree of deference to the decision of the Massachusetts legislature about how best to regulate the possession and use of the proscribed weapons.

In this instance, that decision rests on a web of compelling governmental interests, and the fit between those interests and the restrictions imposed by the Act is both close and reasonable. It follows that the Act withstands intermediate scrutiny — and no more is exigible to blunt the plaintiffs' Second Amendment challenge.

We need go no further. For the reasons elucidated above, the judgment of the district court is

**Affirmed.**